jp

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **STEVEN MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-4029-JAR** |
| | ) | |
| | ) | |
| **TOM VILSACK, Secretary of the** | ) | |
| **United States Department of** | ) | |
| **Agriculture; RISK MANAGEMENT** | ) | |
| **AGENCY; and the FEDERAL CROP** | ) | |
| **INSURANCE CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Steven Miller farmed land in Morton County, Kansas in 2007. Defendants are the Secretary of the Department of Agriculture, the Risk Management Agency ("RMA") of the Department of Agriculture, and the Federal Crop Insurance Corporation. Plaintiff brings this action seeking a court order overturning RMA's decision to deny crop insurance coverage for plaintiff's 2007 dryland corn crop. RMA based its denial of insurance coverage upon a finding that plaintiff did not follow "good farming practices." Both sides have filed briefs.[1] The Court

---

[1] Defendants have filed a motion for leave to file a surreply to plaintiff's reply brief. Doc. No. 22. Plaintiff has filed an objection. Doc. No. 23. Upon review, the Court finds that plaintiff's reply brief raises some new argumentation and points requiring clarification. Therefore, the Court shall grant defendants leave to file a surreply.

has reviewed the briefs and the administrative record and is prepared to rule.

## I.  BACKGROUND

Plaintiff brings this action pursuant to 7 U.S.C. § 1501 <u>et seq.</u> and 7 C.F.R. § 400.98.  This Court has the authority to reverse RMA's denial of insurance coverage if the Court finds that RMA's determination was arbitrary or capricious.[2]

The federal crop insurance program covers losses due to "drought, flood or other natural disaster."[3]  It does not permit the coverage of "losses due to – – . . . the failure of the producer to follow good farming practices . . ."[4] "Good farming practices" is defined as:

> The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance, including any adjustments for late planted acreage, which are: (1) For conventional or sustainable farming practices, those generally recognized by agricultural experts for the area.[5]

---

[2]7 U.S.C. § 1508(a)(3)(B)(iii)(II).

[3]7 U.S.C. § 1508(a)(1).

[4]7 U.S.C. § 1508(a)(3)(A)(iii).

[5]7 C.F.R. § 407.9 (setting forth group risk plan common policy).

## II.  STANDARD OF REVIEW

The Tenth Circuit has stated that an agency's action is arbitrary and capricious "if the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"[6]  "[W]e must determine whether the disputed decision was based on consideration of the relevant factors and whether there has been a clear error of judgment."[7]

## III.  FACTS AND ADMINISTRATIVE FINDINGS

Plaintiff planted and farmed 5,208 acres of dryland corn in 2007, approximately ten miles north of Elkhart, Kansas, in Morton County.  He used a "no-till" method on 1,202 of those acres. Plaintiff did not apply fertilizer or herbicide to any of the acres.  Weather records indicate that Elkhart, Kansas received the following monthly precipitation totals in 2007 with the normal totals listed in parentheses: January - .37 (.44); February - .16 (.54); March - 1.46 (1.15); April - 2.53 (1.54);

---

[6] United Keetoowah Band v. HUD, 567 F.3d 1235, 1239 (10th Cir. 2009)(quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

[7] Utah Environmental Congress v. Dale Bosworth, 443 F.3d 732, 739 (10th Cir. 2006); see also, Payton v. U.S. Dept. Of Agriculture, 337 F.3d 1163, 1168 (10th Cir. 2003)(court must determine whether "the agency examined the relevant evidence and articulated a rational connection between the facts found and the decision made").

May - 1.06 (2.63); June - 2.48 (2.58); July - .98 (2.77); August
- 1.13 (2.29).[8]  Plaintiff started planting corn on May 22, 2007
and finished on June 1st.

Plaintiff obtained a federal crop insurance policy (Policy
No. MP-0614469) covering his 2007 dryland corn crop from Rain and
Hail, L.L.C. ("Rain and Hail").  Plaintiff filed a loss claim on
August 21, 2007, asserting drought as the cause of loss.

On December 12, 2007, Rain and Hail requested a "good
farming practice" determination from the Regional Director of
RMA.[9]  This request noted that Rain and Hail had conducted two
growing season inspections of plaintiff's corn crop on or about
June 19, 2007 and July 12, 2007, performed a final inspection
during the week of September 17, 2007, and consulted with
agricultural experts.  These experts concluded that the crop
failure was due to: "1.) the lack of adequate weed control, 2.)
failure to apply fertilizer, 3.) improper seed bed preparation,
and 4.) failure to plant the crop during the recommended time
period for the area."[10]  This information was shared with
plaintiff and information was requested from plaintiff.  On
November 12, 2007, plaintiff supplied expert opinions from Rick
Kochenower, Dr. Tracey Carrillo and Dr. John Brown to support

---

[8]Administrative Record ("AR") 336, 178-79.

[9]AR 184.

[10]AR 184.

plaintiff's crop loss claim.

Rain and Hail concluded that there was a genuine dispute among agricultural experts and, pursuant to Section II of RMA Bulletin No.: MGR-05-010, requested the RMA Topeka Regional Office to make a "good farming practice" determination regarding plaintiff's loss claim.  Rain and Hail transmitted the complete claim file with expert opinions and statements from both sides to the RMA Topeka Regional Office.

On January 17, 2008, the RMA Topeka Regional Office determined that plaintiff did not follow "good farming practices."[11]  More specifically, the RMA Topeka Regional Office found that plaintiff did not show that he properly prepared the soil for planting, that he timely or properly applied herbicide to control weeds, or that he applied fertilizer.[12]  The RMA Topeka Regional Office also found that photographic evidence of neighboring corn fields showed that plaintiff's fields were not representative of the area.[13]  Plaintiff asked for reconsideration of this determination by RMA's Deputy Administrator for Insurance Services.  The Deputy Administrator found that the determination of the Topeka Regional Office was supported and that plaintiff "failed to follow good farming

---

[11]AR 401–409.

[12]AR 407-08.

[13]AR 408.

practices by the failure to properly prepare the seed bed, [or] to properly provide nutrient management and weed control in the attempt to produce a 2007 corn crop."[14]  Plaintiff has appealed to this Court from that decision.

## IV.  REVIEW OF AGENCY DECISION

The Court must determine whether RMA's decision considered the relevant factors and is supported by the evidence in the record.

### A.  Consideration of the record

Plaintiff contends that RMA's decision failed to consider the drought conditions that plaintiff asserts caused his crop loss.  According to plaintiff, RMA looked at his farming methods in a vacuum without considering how drought conditions affected plaintiff's decisions to use no-till planting methods and to forego applying herbicide and fertilizer.  Plaintiff asserts that this is contrary to RMA Bulletin No.: MGR-05-010 which states that "good farming practice" decisions will be based on:

> The agronomic situation of the producer, which includes material facts about the production methods that were used or will be used to produce the crop as well as weather and climate factors, pest or disease risks, etc. that affect the crop.[15]

RMA's decision states that it "only applies to the application of generally recognized good farming practices in

---

[14]AR 519.

[15]AR 46.

establishing and maintaining [plaintiff's] 2007 corn crop . . .
and does not determine that an insured cause of loss was or was
not present."[16]  Nevertheless, the Court rejects plaintiff's
argument that RMA failed to consider the relevant factor of
drought or weather conditions.  RMA's decision lists all the
documents that were considered before rendering a decision.
These documents included weather records, plaintiff's experts'
opinions and argumentation from plaintiff's representatives.
These materials supported plaintiff's view that drought
conditions caused his crop failure.  Plaintiff's rationale that
drought conditions caused him to forego herbicide and fertilizer
application and to plant no-till corn on some of his acres was
mentioned in RMA's explanation of its findings.[17]  A review of
the administrative record makes clear that drought is the basis
for plaintiff's insurance claim.  It could not be ignored.  The
Court finds that the administrative opinion clearly considered
the impact of drought conditions, but found that plaintiff's crop
loss was not the unavoidable result of drought.  Instead, RMA
found that the loss was caused by a failure to follow recognized
good farming practices.

Plaintiff's reply brief lists other evidence and issues that

_____

[16]AR 510.

[17]AR 517-18.

he claims RMA ignored in its decision.[18]  The Court finds that
RMA did not ignore the issues listed by plaintiff.  Some of the
evidence described may not have been discussed by RMA.  But, RMA
is not obliged to discuss every piece of evidence.[19]  There is
conflicting evidence in the record, which is acknowledged in
RMA's decision.  None of the evidence mentioned by plaintiff is
so critical or uncontroverted that the failure to discuss it
demonstrates a clear error of judgment by RMA or a disconnect
between RMA's decision and the evidence in the record.

    B.   <u>Support for the agency's conclusions</u>

    Plaintiff contends that RMA's decision is contrary to the
evidence in this matter.  The Court rejects this contention.  The
Court will divide its discussion by addressing the three alleged
failures to follow good farming practices and the impact of
drought.

    1.   <u>Seed bed preparation</u>

    The evidence in the record indicates that there was adequate
moisture to produce a stand of corn.  The weather records for
Elkhart, Kansas indicate that the rain deficit for January
through June 2007 was only .69 inches.  There was above-average

---

[18]Doc. 21 at pp. 9-10.

[19]See <u>Lin v. Mukasey</u>, 521 F.3d 22, 28 (1st Cir. 2008)(review of Board of
Immigration Appeals decision); <u>Clifton v. Chater</u>, 79 F.3d 1007, 1009-10 (10th
Cir. 1996)(review of denial of Social Security benefits); <u>Apollo Medical Inc.
v. Sebelius</u>, 2010 WL 2132648 at *15 (E.D.Mo. 4/23/2010)(review under
Administrative Procedure Act of decision denying claim for payment of services
under Medicare Act).

rainfall in March and April. Rainfall in June was only .10 below average. Plaintiff's expert, Dr. Brown, stated that there was sufficient precipitation "for good germination and initial development."[20] Dr. Brown observed a "good stand" on tilled fields on the north farm on June 21, 2007.[21] But, his report does not list any plant counts.

Gary Williams, an insurance adjuster, made the following observations when he inspected plaintiff's fields on or about June 19, 2007:

> "Poor ground preparation."[22]

> "It appears that there was very little effort put into preparing a seed bed before planting."[23]

> "Stand counts ranged from 3,000 to 15,000 in some fields."[24]

Williams also reported that there was fair sub-soil moisture, but poor top-soil moisture as of June 19, 2007.[25] At that time he observed that the crop was under stress because of a lack of moisture from weeds.[26]

---

[20]AR 161.

[21]AR 161.

[22]AR 191.

[23]AR 193.

[24]AR 193.

[25]AR 191.

[26]AR 191.

Gary Kilgore, a professor emeritus at Kansas State University, observed the following after visiting plaintiff's fields from July 9-11, 2007:

> Unit No. 38 - Approximately 318 acres - "There was evidence that field had been planted, but there was no stand."[27]

> Unit No. 39 - Approximately 638 acres - "Evidence that field had been planted, but no corn survived."[28]

> Unit No. 40 - Approximately 318 acres - "South half field did not have a stand of corn. In fact not enough present to count. North half field had scattered corn plants 6" tall and a 4 leaf stage, but not enough present to count."[29]

> Unit No. 41 - Approximately 628 acres - "Scattered corn plants throughout the field at the 3-4 leaf stage . . . Most corn that survived to the date of inspection was in the east half of the field."[30]

> Unit No. 42 - Approximately 634 acres - "Plant population was 12,000 plants/acre."[31]

> Unit No. 43 - Approximately 608 acres - "Some live corn plants in tilled areas . . . No corn plants found in untilled strips."[32]

> Unit No. 44 - Approximately 243 acres - "There was indication that a planter went through field,

---

[27]AR 295.

[28]AR 295.

[29]AR 296.

[30]AR 296.

[31]AR 297.

[32]AR 297.

but no corn survived."[33]

Unit No. 45 - Approximately 242 acres - "This field indicated it was undercut except for a strip on south side. This field did have some corn survive in the undercut area."[34]

Unit No. 47 - Approximately 550 acres - "Good stand of corn at time of inspection. Corn was 6" tall, at 4 leaf stage, 14,000 plants per acre."[35]

Unit No. 48 - Approximately 148 acres - "Plant population was 14,000/acre."[36]

Unit No. 49 - Approximately 161 acres - "Corn was 12" tall at the 5 leaf stage and 14,000 plants/acre."[37]

Unit No. 50 - Approximately 466 acres - "Corn at 4 leaf, 6" tall and 14,000 plants/acre."[38]

Unit No. 51 - Approximately 254 acres - "No corn plants visible. Field appears to be abandoned."[39]

The record shows that plaintiff planted 15,000 seeds per acre.[40] Therefore, fields with plant populations of 12,000 or

---

[33]AR 298.

[34]AR 298.

[35]AR 299.

[36]AR 299.

[37]AR 300.

[38]AR 300.

[39]AR 301.

[40]AR 161.

14,000 plants per acre suggest a good stand of corn.[41] There was enough moisture to produce a good stand according to Dr. Brown. Some fields did produce a good stand. But other fields (more than half) did not have a good stand approximately six weeks after they were planted. This information, together with the moisture records and the reports from Williams and Prof. Kilgore, provide substantial evidence for the conclusion that seed bed preparation was not adequate for some of the fields.

Plaintiff argues that RMA's criticism of plaintiff's seed bed preparation is a flat rejection of no-till dryland corn farming without acknowledging that no-till methods are generally recognized and approved by agricultural experts. The Court disagrees. RMA's decision does not categorically reject no-till farming. RMA criticized planting corn into standing weeds and questioned plaintiff's claim that dry conditions justified no-till planting when plaintiff had strips of tilled corn and untilled corn in the same field.[42]

### 2. Lack of herbicide application

Plaintiff's corn crop had a significant weed problem. Dr. Brown stated that on June 21, 2007 he observed some clean tilled

---

[41]One expert's report in this case stated that any level less than 8,000 plants would not be acceptable. (AR 338).

[42]AR 517.

fields on the north and south farms.[43]  However, he also observed that the "no-till sections of the North Farm showed significant weed development."[44]  On August 13, 2007, during a second visit to the farm, Dr. Brown noted that "[n]o-tilled fields show[ed] significant weed pressure and most corn plants were either dead or severely stressed."[45]  As for the tilled fields, Dr. Brown stated that weed pressure was significant in some areas and low in others.[46]

The insurance adjusters and experts contacted by the crop insurance company noted significant weed control problems in plaintiff's 2007 corn crop.  Gary Williams observed weed problems in all the fields.  Prof. Kilgore stated that his reaction to the first field he visited on July 9, 2007 was that it was abandoned or a first year CRP grass planting and that "field after field showed the same conditions."[47]  Even the fields with good stands were weedy, according to Kilgore:

> Unit No. 42 – "Field bindweed was abundant
> throughout field.  No weed control was
> evident.  Spiney sandbur and foxtail were 2-
> 4" tall and 8-16 plants/sq. foot."[48]

---

[43]AR 161.

[44]AR 161.

[45]AR 162.

[46]AR 162.

[47]AR 293.

[48]AR 297.

Unit No. 47 - "There was no evidence of weed
control after planting.  Sandbur and foxtail
produced a solid ground cover 2-4" tall.
There were more than 16 weedy plants/sq.
foot.  These corn plants were dying."[49]

Unit No. 48 - "Field was solid foxtail and sandbur
weeds 3-4" tall and greater than 16
plants/sq. foot."[50]

Unit No. 49 - "Major weed problems.  Pigweeds 3-6"
tall (6/sq. foot) and sandburs 2/4" (8/sq.
foot).  Bindweed covered 75% of field."[51]

Unit No. 50 - "Bindweed, foxtail and sandbur
abundant.  Greater than 12 plants/sq. foot. .
. Pigweeds were 6/12" tall throughout
field."[52]

Dr. Flowerday reviewed this evidence and concluded that the
lack of weed control alone was sufficient to cause crop
failure.[53]

Of course, one way of controlling weeds is through the
application of herbicide.  Plaintiff did not apply herbicide to
his corn crop or engage in any other means of weed control.
Plaintiff has indicated that he contacted Skyland Grain, Inc.
("Skyland") to apply herbicide on his corn crop and that Skyland
agreed to do so, but backed out of the agreement.  Plaintiff has

_____

[49]AR 299.

[50]AR 299.

[51]AR 300.

[52]AR 300.

[53]AR 338.

14

suggested that a crop insurance investigation should be blamed for this because there was an allegation that Skyland improperly applied atrazine to plaintiff's 2006 cotton crop. It has been stated that plaintiff decided to plant "no-till" acres to preserve evidence for the 2006 cotton crop insurance investigation. Dr. Brown indicated that this decision was made on short notice, leaving plaintiff no time to contract for "burn-down" herbicide application in advance of planting.[54]

Plaintiff has asserted that after he learned that Skyland was not going to apply herbicide he contacted other chemical applicators who told him it would not be worthwhile to apply herbicide to his failing crop. One such applicator, Mr. Jesus Tarin, wrote that he was contacted by plaintiff on July 2, 2007 to look at fields for weed control, but he recommended that it would be wasting money to spray the fields at that time.[55] This was more than a month after planting. The Kansas State University Corn Production Handbook states that "a successful weed-control strategy should assure weed-free conditions for at least a month after planting."[56]

In the concluding paragraphs of Dr. Brown's opinion he states:

---

[54]AR 162.

[55]AR 144.

[56]AR 373.

> At first, it might appear that [plaintiff]
> abandoned his corn crop. However, after all
> the evidence is eventually discovered,
> analyzed and presented, RMA and [the Office
> of Inspector General (OIG)] should bear the
> responsibility for interfering in Miller's
> commercial operation. Their methods of
> investigation, in my opinion, initiated a
> chain of events that prevented [plaintiff]
> from accomplishing good farming practices.[57]

Thus, Dr. Brown indicates that plaintiff failed to accomplish good farming practices but assesses blame against RMA and OIG, rather than the drought or some other natural cause covered by crop insurance.[58]

Plaintiff has also argued that it was the drought that caused plaintiff's corn to deteriorate so much that herbicide application was not worthwhile. However, there were fields with good stands of corn which became too weedy. Obviously, weeds compete with corn for moisture and nutrients, and compound the effect of dry conditions. The Corn Production Handbook states: "There is a pound for pound trade-off of corn dry matter for weed dry matter. . . . It is vital, therefore, that weeds in the cornfield be controlled."[59] Reviewing the record, the Court

---

[57]AR 163.

[58]A RMA officer who spoke with plaintiff on May 22, 2007 regarding the 2006 cotton crop loss denied making any statement or request that would have affected plaintiff's farming decisions regarding the 2007 corn crop. (AR 343). The RMA found that no restrictions were placed upon plaintiff's farming practices for the 2007 corn crop and that any allegations that the government interfered with herbicide application were not factual. (AR 517).

[59]AR 372.

finds there is substantial evidence to conclude that plaintiff
failed to employ good farming practices when he did not apply
herbicide to his corn crop in a timely fashion.

### 3. Absence of fertilizer

Plaintiff did not apply fertilizer in advance of or after
planting his crop. One of plaintiff's experts, Dr. Carrillo,
stated that there should have been sufficient nitrogen from
natural sources (rainfall, breakdown of organic matter,
lightning, and snowfall) to produce a satisfactory yield without
the application of fertilizer.[60] He also stated that dry
conditions can impede the effectiveness of fertilizer. Dr.
Carrillo further cited a study conducted at Kansas State Research
Extension Centers in western Kansas.[61] The study concerned the
use of nitrogen on no-till dryland corn and found a yield
increase from nitrogen application at only one out of four sites.
One of the study's authors has noted that the corn in the study
was planted into standing wheat stubble after about a 10-month
fallow period and that herbicides were used and achieved good
weed control at all sites. He determined that residual soil
nitrogen (greater than 3ppm nitrate-N in a 0-24 inch sampling
depth at all sites) was sufficient to meet the nitrogen

---

[60]AR 148.

[61]AR 155-158.

requirements at the sites.[62]

The Corn Production Handbook states that:

> "Even with good overall crop management, few
> Kansas soils will sustain profitable corn
> production without supplementation of several
> crop nutrients from fertilizers, manures,
> and/or legume rotations."[63]

> "Nitrogen application for corn can be made at
> several times with equal results on most land
> in Kansas.  Nitrogen may be applied before
> planting, at planting time, and/or as a
> sidedressing after corn is up."[64]

Prof. Kilgore stated:

> Six fields were sampled for soil testing.  A
> 6 inch deep sample was taken.  That depth
> would show if any nitrogen was applied and
> present.  I also tested for pH, organic
> matter (OM), phosphorus (P), and
> potassium(K).  All soil tests showed very low
> nitrate-nitrogen tests showing readings from
> 1 to 4 parts per million (PPM). . . . That is
> extremely low.  An acceptable rate would be
> 20-30 PPM for dryland corn in Morton
> County.[65]

Prof. Kilgore noted signs of nitrogen deficiency when he

inspected corn plants in plaintiff's fields.  Even in fields with

good stands, plants were yellow or exhibited lower red leaves,

which indicated nitrogen deficiency according to Prof. Kilgore.[66]

---

[62]AR 348.

[63]AR 365.

[64]AR 367.

[65]AR 294.

[66]AR 299.

Dr. Carrillo has attributed the "purplish" leaves to drought conditions.[67]

Dr. Flowerday referred to the nitrogen content in the soil samples taken from plaintiff's fields. The nitrogen content ranged from 1 ppm to 4 ppm with an average of 2.2 ppm. He concluded that the amount of nitrogen per acre might have produced 4.0 bushel of corn per acre, but in reality the weeds would have used all the soil available nitrogen. He stated that the lack of nitrogen alone was sufficient to cause a crop failure.[68]

RMA's decision stated that when the nitrogen value of organic material was combined with the available nitrogen in the soil, there were 43 more pounds of nitrogen available in the Kansas State University research plots than in plaintiff's fields.[69]

Plaintiff has argued that the soil samples were not taken properly on plaintiff's fields. A statement from the Kansas State Agricultural Experiment Station and Cooperative Extension Service indicates that a subsoil sample from 24 inches deep is necessary to test for available nitrogen, although it also states

---

[67]AR 147.

[68]AR 338.

[69]AR 516.

that row crops should be tested at 6 to 8 inches deep.[70]  The

soil samples in this matter were taken from 6 inches deep.

     There is a conflict in the evidence as to whether the

failure to apply fertilizer was a failure to employ a good

farming practice.  RMA's decision is contrary to Dr. Carrillo's

opinion, but it is supported by substantial evidence from the

Corn Production Handbook, Prof. Kilgore and Dr. Flowerday.

          4.  <u>Drought conditions</u>

     Plaintiff contends that drought conditions were the primary

cause of the corn crop failure and, in essence, dictated his

decision to employ no-till methods on some acres and to shelve

any application of herbicide or fertilizer.  RMA determined that

the absence of good farming practices caused the loss in this

case and that plaintiff's farming practices were not excused by

weather and climate factors.  The Court finds that substantial

evidence supports RMA's determination.

     There was not a large moisture deficit for the first six

months of 2007 and there was enough moisture to produce a good

stand of corn in several of plaintiff's fields.  Subsoil moisture

was considered fair in the middle of June.  Yet, crop inspections

indicated that much of plaintiff's corn crop was dead or dying in

June or early July because of poor weed control, poor seed bed

---

[70]AR 427-28.

preparation and an absence of fertilizer.  Gary Williams and
Prof. Kilgore observed other corn fields in the vicinity of
plaintiff's fields that appeared in much better condition.  In
addition, the overall loss ratio for Morton County corn in 2007
was .36.  According to RMA's decision, the loss ratio in 2006 was
1.07 and the 2007 crop year was one of the best on record.[71]

Dr. Brown stated that he observed poor crop conditions in a
dryland field a mile from plaintiff's field, even though that
field had been sprayed with herbicide.[72]  Dr. Brown further
stated that he harvested several ears from plaintiff's fields and
found them comparable to dryland corn from a different farmer's
crop.  Drs. Brown and Carrillo also noted that plaintiff's corn
was better in certain isolated areas where moisture may have
collected.

Both sides have submitted photographs to support their
contentions regarding drought conditions and the condition of
plaintiff's and neighboring fields.

After reviewing the administrative record, the Court
believes the weight of the evidence supports RMA's decision that
plaintiff's crop failure was caused by the absence of good
farming practices, which is not excused by the weather or climate
factors.  The Court understands that rain does not fall uniformly

_____

[71]AR 518.

[72]AR 162.

in Morton County, Kansas.  So, the rainfall amounts in Elkhart may or may not have fallen on plaintiff's fields.  However, the observations of plaintiff's fields indicate that there was enough moisture to produce good stands of corn if there had been adequate weed control and other good farming practices.  The identification and collection of corn from isolated portions of plaintiff's fields where moisture or weed control was more favorable, and the existence of poor crops in some neighboring fields does not alter the balance of evidence in the Court's opinion.

## V.  CONCLUSION

For the above-stated reasons, the Court rejects plaintiff's contention that RMA's decision is arbitrary, capricious or contrary to substantial evidence.

**IT IS THEREFORE ORDERED BY THE COURT** that RMA's decision is upheld and plaintiff's prayer for relief is denied.

**IT IS FURTHER ORDERED BY THE COURT** that defendants' motion for leave to file a surreply brief (Doc. No. 22) is granted.

**IT IS SO ORDERED.**

**Dated:** June 14, 2010

 S/ Julie A. Robinson
**JULIE A. ROBINSON**
**UNITED STATES DISTRICT JUDGE**